## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case No.  3:15-cr-17-J-32JRK

GEORGE HENRY PETRAKIS
_____/

## REPORT AND RECOMMENDATION[1]

### I.  Status

This cause is before the Court on Defendant George Henry Petrakis's Motion to Suppress Evidence from Unlawful Stop, Detention and/or Search (Doc. No. 36; "Motion"), filed May 4, 2015.  In the Motion, Defendant seeks "to suppress all evidence obtained following [a] December 10, 2014 stop of Defendant's vehicle and/or detention of Defendant following the stop and/or the warrantless search of Defendant's vehicle following the detention."  Motion at 1.  The Government filed a response in opposition to the Motion on May 15, 2015.  See United States' Memorandum Opposing Defendant['s] Motion to Suppress (Doc. No. 39; "Response").  An evidentiary hearing on the Motion was held on June 16, 2015 and June 19, 2015.[2]  See Amended Minute Entry (Doc. No. 50); Minute Entry

---

[1]        "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], … a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim. P. 59(b)(2).  "Failure to object in accordance with this rule waives a party's right to review."  Id.; see also 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

[2]        The evidentiary hearing was originally set for May 20, 2015 (Doc. No. 37), but was continued to June 16, 2015 on the unopposed motion of the Government (Doc. Nos. 40, 43).  Prior to the hearing, on June 3, 2015, the Government filed a Motion to Exclude Defendant George Henry Petrakis's Tendered Expert Witness Lisa Russell and Memorandum of Law (Doc. No. 44; "Motion to Exclude"), in which the Government sought to exclude Defendant's proffered canine expert, Lisa Russell, from testifying at the suppression hearing based upon Rule 702, Federal Rules of Evidence, and Daubert principles.  Defendant responded in opposition on June 10, 2015.  See Response to United States' Motion to Exclude Defendant George Henry Petrakis's Tendered Expert Witness Lisa Russell and Memorandum of Law (Doc. No. 45).  On June 12, 2015, the
(continued...)

(Doc. No. 51); Transcript of June 16, 2015 Hearing (Doc. No. 60; "First Tr."); Transcript of June 19, 2015 Hearing (Doc. No. 62; "Second Tr.").  Thereafter, the parties filed supplemental memoranda in support of their respective positions.  See Defendant's Amended Supplemental Memorandum in Support of Defendant's Motion to Suppress Evidence From Unlawful Stop, Detention and/or Search (Doc. No. 65; "Defendant's Supplemental Memorandum"), filed July 30, 2015; United States' Response to Defendant's Supplemental Memorandum (Doc. No. 66; "Government's Supplemental Memorandum"), filed August 12, 2015.

This case involves law enforcement officers pulling over Defendant on the interstate two different times in one day and ultimately discovering in his vehicle more than seven kilograms of cocaine, as well as small amounts of other drugs and paraphernalia.  The first time, officers suspected illegal drug activity, but their drug-detecting canine failed to alert to the presence of narcotics in the vehicle.  Still suspicious, those officers then had contact with another officer down the road, described the vehicle Defendant was driving, and explained why they were suspicious of him.  With this information, the other officer pulled over Defendant a short time later and called a different drug-detecting canine to sniff the vehicle. This time, the canine alerted twice to the presence of illegal drugs inside the vehicle, albeit not in the way he was trained to do so, and the vehicle was searched.  Defendant contests

---

[2](...continued)

undersigned denied the Motion to Exclude, noting that "[i]n similar circumstances, courts have declined to apply Rule 702 and Daubert to exclude expert testimony during suppression hearings."  Order (Doc. No. 46) at 2 (citations omitted).  The parties were notified that the undersigned would "hear Ms. Russell's testimony during the suppression hearing and afterwards determine the weight to afford it as part of the undersigned's ultimate recommendation on the suppression issue."  Id. at  3 (citation omitted). It was also specifically noted that the denial of the Motion to Exclude "is limited to the suppression hearing only."  Id. at 3 n.1.

the legality of the second stop, not the first.  See First Tr. at 6-9.  However, the circumstances surrounding the first stop are relevant to a number of arguments he raises about the second stop and the resulting search.

## II.  Procedural History

On December 11, 2014, a criminal complaint (Doc. No. 1) was filed charging Defendant with knowingly possessing with intent to distribute in excess of five kilograms of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  Defendant made his initial appearance before the Honorable Joel B. Toomey, United States Magistrate Judge, to whom the matter was originally assigned, on December 12, 2014.  See Minute Entry (Doc. No. 5).

After a number of extensions for having the preliminary hearing and seeking an indictment under the Speedy Trial Act were obtained (Doc. Nos. 23, 24, 26, 27), on February 18, 2015, the grand jury returned an indictment charging Defendant with one count of knowingly and intentionally possessing and causing to be possessed with the intent to distribute five kilograms or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Doc. No. 28).  Upon the filing of the indictment, the case was assigned to the undersigned. Defendant was arraigned on February 23, 2015, and he entered a not guilty plea (Doc. No. 31).

Thereafter, the Motion and related papers were filed, and the evidentiary hearing was held.  The Motion is now ripe for consideration.

### III.  Evidentiary Hearing

The Government presented four witnesses during the evidentiary hearing, all Troopers with the Florida Highway Patrol ("FHP"): Nathaniel Lee Cabe ("Trooper Cabe")[3]; Brian Lundy ("Trooper Lundy")[4]; Jason Lemery ("Trooper Lemery")[5]; and Brian Creech ("Trooper Creech")[6].  In addition, the Government submitted a number of exhibits that were received into evidence.  See Gov.'s Exs. 3, 4, 5, 6, 7, 8, 9, 10, 11, 12A-C, 13, 14.  Defendant presented one witness: Lisa Ann Russell ("Ms. Russell"), who was offered as a canine expert.  Defendant also submitted a number of exhibits that were received into evidence.  See Def.'s Exs. 1, 2, 3, 4.  The law enforcement witnesses testified consistently with each

---

[3]      Trooper Cabe has worked for FHP for more than seven years.  First Tr. at 16.  He has been assigned to the Criminal Interdiction Unit since October 2014.  Id. at 16-17.  The Criminal Interdiction Unit "is set up statewide to interdict . . . criminals traveling up and down the highways throughout the state of Florida." Id. at 167.  The troopers in the Unit work in teams of two, and "[t]here are typically multiple teams in each troop scattered throughout the state."  Id.  Prior to working in the Criminal Interdiction Unit, Trooper Cabe was assigned to road patrol.  Id. at 17.

[4]      Trooper Lundy has worked for FHP for almost fifteen years.  First Tr. at 113.  He is assigned to the Criminal Interdiction Unit and has been for approximately five years.  Id. at 113-15.  Prior to that, he was assigned to road patrol.  Id. at 114.  He is currently a canine handler.  Id. at 115.  His assigned canine, Marko, a German Shepard, stays with him twenty-four hours per day, seven days per week.  Id.  The two have been together for the approximately five years that Trooper Lundy has been in the Criminal Interdiction Unit.  Id.  Trooper Lundy testified extensively about his and Marko's training, see id. at 116-36, 153-56, 162-65, but a discussion of that testimony is not necessary to resolve the instant issues.  Trooper Lundy also testified about the number of times he and Marko have been deployed to conduct searches: 122, of which Marko has alerted to the presence of narcotics sixty-five times.  Id. at 138-40. Of those alerts, contraband was found sixty times.  Id.

[5]      Trooper Lemery has worked for FHP for almost twenty-one years.  First Tr. at 166.  He has been assigned to the Criminal Interdiction Unit for seventeen years.  Id. at 166-67.  He has extensive training and teaching experience in criminal interdiction.  Id. at 167.  Trooper Lemery is assigned to "Troop B," which covers nine counties in the northern part of Florida.  Id. at 168.

[6]      Trooper Creech has worked for FHP for more than twenty-one years.  Second Tr. at 67.  He has been assigned to the Criminal Interdiction Unit for more than two years.  Id.  This is his second stint in the Criminal Interdiction Unit, the first being from late 1994 to early 2000.  Id. at 67, 95.  He is a canine handler, and he has worked with his canine, Nick, for two years.  Id. at 67.  Information about Trooper Creech's and Nick's training and experience appears infra at Part III, B.

other.  The undersigned credits the law enforcement officers' testimony in whole.[7]  The

officers' testimony about the events on the day in question is summarized first, followed by

a summary of the alerting canine's qualifications and the circumstances of his alerts, and

finally, a summary of Ms. Russell's testimony and opinions.

## A.  Law Enforcement Testimony

On December 10, 2014, Trooper Cabe was on duty.  First Tr. at 26.  His patrol

vehicle, an FHP-marked Tahoe, was parked facing southbound around mile marker 235 of

I-10 where Jefferson and Madison counties meet.  Id. at 27, 44.  According to Trooper Cabe,

I-10 is a known corridor for drug traffickers.  Id. at 44, 46.

Trooper Cabe was monitoring eastbound traffic along with his canine-handling

partner, Trooper Lundy, who was parked close by in a separate patrol vehicle, when a blue

minivan caught Trooper Cabe's attention.  Id. at 27, 141.  He believed the minivan was most

likely a rental vehicle given its color and its out-of-state license plate.[8]  Id. at 27.  The driver

"was pushed back and hiding behind the B pillar," id., which is the area of the car behind the

driver's side window where the seat belt hangs down, id. at 20.  Trooper Cabe also observed

a passenger in the vehicle, although he could not tell if the passenger was a male or female.

Id. at 27.

---

[7]     In making these credibility determinations, the undersigned considered various factors including the witnesses' demeanor, the consistencies or inconsistencies within the witnesses' testimony, and any interest the witnesses may have in the outcome of the hearing; but, the undersigned did not consider the official rank or status of the witnesses.  United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

[8]     Trooper Cabe also described two other possible indicators of rental vehicles, including that they do not typically have tinted windows, and they typically have a bar code on the side.  First Tr. at 27.  His testimony left open whether the blue minivan had these indicators.  See id.

As the blue minivan approached, it was traveling at a rate of sixty-five to seventy miles per hour and was in the outside "slow" lane of traffic. Id. at 27-28. Once past the FHP vehicle, the minivan continued at the same rate of speed in the "slow" lane. Id. Trooper Cabe pulled his patrol vehicle onto the highway and caught up with the blue minivan at mile marker 237 or 238. Id. at 28. When he caught up to the minivan, Trooper Cabe was in the inside "fast" lane, and the minivan was still in the outside "slow" lane. Id.

Trooper Cabe pulled up next to the minivan and observed the driver, who had a freshly lit cigarette in his hand. Id. Trooper Cabe rode next to the minivan for twenty to twenty-five seconds, and the driver never acknowledged him. Id. Trooper Cabe then "backed off just a little bit" and noticed the passenger pull down the sun visor. Id. He then observed the passenger attempting to find him in the mirror of the sun visor, which was "another red flag" to him. Id. at 28-29. Trooper Cabe then pulled beside the minivan again, and the driver kept his "hands straight back" and kept "leaning back, still smoking a cigarette." Id. at 29. The passenger was looking at Trooper Cabe, and at this point Trooper Cabe could tell the passenger was a white female. Id.; see Gov.'s Ex. 9 (photograph of passenger).

Trooper Cabe was suspicious that the occupants of the minivan may be involved in illegal activity, but he did not believe he had probable cause to stop the minivan for any traffic violations. First Tr. at 29-30. Trooper Cabe continued to pull alongside the minivan, doing this at least three to four times in total. Id. at 30. The driver never acknowledged him. Id.

Finally, Trooper Cabe observed the minivan following another vehicle too closely, meaning the minivan "was behind the rear of [the other] vehicle at an unsafe distance." Id. Trooper Cabe described that the minivan was at maximum two and one-half to three car lengths from the rear of the vehicle in front of it. Id. at 32-33.  He therefore initiated a traffic stop around mile marker 249.  Id. at 30.

Sometime prior to actually stopping the minivan, Trooper Cabe had checked the license plate and determined that it was indeed a rental vehicle. Id. at 31.  After pulling over the minivan, Trooper Cabe approached it on the passenger side.  Id. at 30, 56.  As he approached, he observed trash and drinks in the car, and he "noticed [an] air freshener hanging from the rearview mirror." Id. at 30, 105; see Gov.'s Ex. 10 (photograph of trash and drinks); Gov.'s Ex. 11 (photograph of air freshener).  He thought it was odd that there was an air freshener in the minivan.  First Tr. at 31, 34.  He explained at the hearing that rental companies do not keep older vehicles in their repertory so the minivan was likely newer, and rental vehicles are cleaned in between uses so it had likely been recently cleaned.[9]  Id.  To Trooper Cabe, the air freshener was a possible indicator the passengers were attempting to cover up an odor.[10]  Id. at 31.  Trooper Cabe also deduced from the trash and drinks in the car that the occupants had been riding for a long time without stopping for any length of time.  Id.  He testified it was apparent to him they were eating "on the go." Id.; see also id. at 94-95.

---

[9]    The record reflects that the minivan is a 2013 Dodge Caravan.  First Tr. at 104; Gov.'s Ex. 2.

[10]    Trooper Cabe recognized on cross examination that Defendant was smoking a cigarette prior to being stopped, and an air freshener could have been intended to address the cigarette and/or an old food smell in the air inside the minivan.  First Tr. at 105.

Trooper Cabe asked the driver, Defendant, to step out of the vehicle. Id. at 38, 57. Defendant did so and met Trooper Cabe at the back of the minivan. Id. at 38. According to Trooper Cabe, Defendant "was a little nervous." Id. Trooper Cabe asked Defendant where he was traveling to, and Defendant responded that "he was on vacation in Ocala." Id. at 39. Trooper Cabe explained that he had stopped Defendant for following another vehicle too closely. Id. Trooper Cabe asked whether the rental agreement was in the minivan, and Defendant responded that it was. Id.

Trooper Cabe then returned to the passenger side of the minivan to speak with the passenger. Id. He asked the passenger if she could find the rental agreement and asked for her identification. Id. at 39, 93-94. He also asked where the two were coming from and where they were going. Id. at 39. She replied that they were coming from Texas and heading "back home to Ocala." Id. The passenger was not nervous at all. Id. Trooper Cabe found it odd that the passenger claimed Ocala was their home after the driver had just told him they were vacationing in Ocala. Id. at 40.

Trooper Cabe asked whether the driver and passenger were related. Id. The passenger responded that they were dating. Id. Trooper Cabe thought this was unusual because there was an approximately twenty-year age difference between the driver, an older male, and the passenger, a younger female. Id. Trooper Cabe also realized after reviewing the rental agreement that the minivan had been rented just two days earlier, on December 8, 2014. Id. at 41-42. He thought it was a rather short period of time drive to Texas and return to Florida, given that a one-way trip from Texas to Ocala is about a twelve-hour drive. Id.

Trooper Cabe left the passenger in the minivan and called his partner, Trooper Lundy, on the radio for some assistance. Id. at 43, 47, 141-42. Trooper Lundy was about fifteen miles away from Trooper Cabe when he was called, and it was going to take him about ten minutes to get there. Id. at 142.

Trooper Cabe then walked to the back of the minivan where Defendant was standing. Id. at 40-41. Trooper Cabe asked Defendant what the two were doing in Texas, and Defendant responded that he was looking at some cars in Houston for a friend for whom he worked. Id. at 41, 42-43, 94. Apparently this work was being performed for Dade City Automax. Id. at 59-60, 94.

Trooper Cabe returned to his patrol vehicle, got into the front passenger's seat, and ran Defendant's license and the passenger's identification on the computer in his vehicle. Id. at 47, 59, 91, 93-94. Defendant sat five to six feet away on the guardrail. Id. at 47. Because Defendant had an out-of-state license, it took a little while longer to perform the license check than it does when Trooper Cabe performs checks on Florida licenses. Id. at 48. The check revealed that Defendant had a valid license and no warrants. Id. at 47-48, 91, 101. There were no concerns about the passenger's history either. Id. at 100-01.

Trooper Cabe asked Defendant how many cars he was looking at in Texas. Id. at 48-49. Defendant responded that he was looking at four and bought three or four. Id. at 49. When asked why Defendant did not have the passenger drive one of the cars back, Defendant responded that she did not have a license. Id. at 49. Trooper Cabe returned to the passenger "to verify the story about the cars." Id. The passenger confirmed that

Defendant "went to Texas to look at some cars for work," but she did not know how many cars. Id. at 49; see also id. at 65.

At that point, Trooper Lundy arrived. Id. at 49, 142. Knowing that Trooper Lundy would be working with his canine around the minivan and that the canine officers do not like anyone to be inside a vehicle when it is sniffed by a canine, Trooper Cabe asked the passenger to step out of the minivan. Id. at 49-50; see also id. at 142-43. Trooper Cabe then brought the passenger to the area where Defendant was waiting. Id. at 50.

Trooper Lundy got his canine, Marko, out of his patrol vehicle and ran Marko around the minivan twice, the typical number of times for a vehicle search. Id. at 50, 142, 144. While that was occurring, Trooper Cabe was using his computer to issue Defendant a warning for following too closely. Id. at 50.

Trooper Lundy believed Marko was distracted during the search because he was not sniffing door seams like he usually would and because he seemed uninterested. Id. at 145-46, 148, 151-52. This type of behavior, just "[g]oing through the motions" as Trooper Lundy described it, was very unusual for Marko. Id. at 148, 152. In the end, after being run around the vehicle twice, Marko did not alert to the presence of any narcotics. Id. at 50-51. Trooper Lundy declined to have Marko make another pass around the vehicle because the two of them were not trained to do more than two passes. Id. at 147-48. He was afraid another pass could lead to a false positive alert. Id. at 148. Trooper Cabe issued the warning and

sent Defendant and the passenger on their way. Id. at 51; see Gov.'s Ex. 2 (warning issued by Trooper Cabe).[11]

Still suspicious of criminal activity, Trooper Lundy called Trooper Lemery, who was part of another interdiction team working that day to the east of where the stop occurred, to advise him what had just transpired. First Tr. at 103-04, 149, 171. Trooper Lundy told Trooper Lemery that he and his partner had just been on a traffic stop and let the person go, "but there were some things about the traffic stop that were suspicious to them, [so Trooper Lemery] should call Trooper Cabe and get the details." Id. at 169. Trooper Lemery then called Trooper Cabe. Id. at 169-70, 171.

Trooper Cabe advised Trooper Lemery that he had "stopped a vehicle on I-10 in Madison County . . . traveling eastbound [that] was occupied by a middle-aged white male and a female[.]" Id. at 170. Trooper Cabe described the vehicle as a "dark-colored minivan with New York plates" and as having a "lived-in look[.]" Id. at 170, 173. Trooper Cabe further advised that "the occupants of the vehicle had rented it approximately two days earlier in Central Florida," then they drove to Houston, Texas, and were now back in Florida. Id. at 170. Trooper Cabe or Trooper Lundy told Trooper Lemery that the dog had not alerted to the presence of any narcotics, and they had not asked for consent to search the vehicle.[12]

---

[11]     The entire encounter between Troopers Cabe and Lundy and Defendant and the passenger was captured by a dashcam on Trooper Cabe's patrol vehicle. First Tr. at 54; see Gov.'s Ex. 1 (video). This includes both video and audio. First Tr. at 54; see Gov.'s Ex. 1. As the video of the encounter reflects, the entire length of the stop from the time Defendant was pulled over to the time he was sent on his way was sixteen minutes (2:14 p.m. to 2:30 p.m.). See Gov.'s Ex. 1; First Tr. at 100.

[12]     Trooper Lemery could not recall whether Trooper Lundy or Trooper Cabe told him this information, but he remembered being told by one of them. Second Tr. at 5.

Id. at 171; Second Tr. at 5.  Trooper Lemery was very surprised that Trooper Cabe had not asked for consent to search the vehicle.  First Tr. at 223; Second Tr. at 48.

Armed with this information,[13] Trooper Lemery decided he would look out for the vehicle.  First Tr. at 171; Second Tr. at 10.  He assumed that the vehicle would likely turn south on I-75.  First Tr. at 173; Second Tr. at 7-8.  Accordingly, he traveled north to "sit in the interstate crossover, which is a gap in the guardrail system[] that law enforcement vehicles or emergency vehicles can turn around in."  First Tr. at 171.  Trooper Lemery then called a canine handler on his team, Trooper Creech, and advised that he was looking out for a particular vehicle and if he stopped it, he wanted Trooper Creech "to come walk [his] dog."[14]  Id. at 171; see also id. at 172; Second Tr. at 16.

Eventually, Trooper Lemery spotted a vehicle that fit the description given to him by Trooper Cabe.  First Tr. at 173.  As the vehicle approached, "the driver's head was behind the B pillar," so Trooper Lemery could not see the driver.  Id. at 173-74.  Trooper Lemery also could not read the license plates, but he suspected that they were New York plates.  Id. at 174.

Trooper Lemery let the vehicle pass and continued watching the vehicles behind it to see whether any others matched the description.  Id.  Not finding any, he pulled out and

---

[13]    Although he had certain information, Trooper Lemery was not aware of whether Trooper Cabe had run criminal history checks or wanted persons checks on the individuals in the minivan.  First Tr. at 221.  Trooper Lemery also did not know at the time that Trooper Cabe had issued a warning to Defendant.  Second Tr. at 11.  Trooper Cabe's team is based out of Tallahassee; Trooper Lemery's is based out of Jacksonville.  First Tr. at 228.  The two teams cannot hear each other's dispatch information over the radio.  Id.  When an offense report or a warning is issued, however, it goes to a central FHP database that can be accessed by all FHP officers.  Id. at 229.

[14]    Trooper Creech is not Trooper Lemery's partner, but Trooper Lemery's partner was outside the immediate area that day.  First Tr. at 169, 173.

headed south to attempt to catch up with the vehicle he had spotted earlier before it got too far away. Id. He eventually caught up with the vehicle around the 417-mile marker. Id. The vehicle was in the center lane; Trooper Lemery was originally in the right lane but crossed over to the left lane and started pacing it at seventy-eight miles per hour. Id. The posted speed limit was seventy miles per hour. Id. at 182.

The vehicle slowed to seventy-five miles per hour, although Trooper Lemery did not see any brake lights, and it maintained that speed for about one mile. Id. at 175. Trooper Lemery ran the tag in his computer, "and it [indeed] matched the vehicle description given to [him] by Trooper Cabe." Id.; Second Tr. at 14-15. He then pulled alongside the driver and by this time, he could see the driver's face because it was no longer behind the "B pillar." Second Tr. at 11-12. The driver looked straight ahead and never looked at Trooper Lemery. First Tr. at 175-76; Second Tr. at 11. The passenger also stared straight ahead. First Tr. at 175-76; Second Tr. at 11. The driver and passenger were not talking at all. First Tr. at 176. Trooper Lemery testified it was out of the ordinary for the individuals to look straight ahead like that because "people commonly will look over at a patrol car beside them." Id. at 175.

Trooper Lemery decided to initiate a traffic stop for speeding, but he wanted to wait until two exits down the interstate because the second exit was safer. Id. at 176-77. He called Trooper Creech and requested that Trooper Creech head toward him. Id. at 200; Second Tr. at 87. Trooper Creech started in Trooper Lemery's direction. Second Tr. at 87.

When Trooper Lemery activated his lights to pull over the vehicle, it was 3:27 p.m. Second Tr. at 14; see Gov.'s Ex. 5.[15]  After pulling over, Trooper Lemery got out of his patrol vehicle and approached the minivan on the passenger side for officer safety reasons.  First Tr. at 182.  As he approached, he saw "little to nothing" in the rear cargo area; some loose clothing in the second seat and a handbag on the floor; and in the front, he saw "drink cups, cigarettes, [and] a Christmas tree style air freshener hanging from the rearview mirror[.]"  Id. at 183-84.

The passenger's window was rolled down.  Id. at 183.  The passenger, a female whose name he later discovered was Kelly Watts, was wrapped in a blanket.  Id. at 184-85. Trooper Lemery could not tell if she was wearing any clothes under the blanket.  Id.  She appeared to Trooper Lemery to be a teenager.  Id. at 185.  Her Florida identification card was sitting on her lap.  Id. at 186.

Trooper Lemery explained to Defendant, the driver, that he had stopped the vehicle for going seventy-eight miles per hour.  Gov.'s Ex. 5; see Second Tr. at 56.  Defendant responded that he had the cruise control set on seventy-four miles per hour.  First Tr. at 185-86; see Gov.'s Ex. 5.  Trooper Lemery then asked for Defendant's driver's license.  First Tr. at 187; Second Tr. at 20.  Defendant handed it over.  First Tr. at 187; Second Tr. at 58.  His hand was shaking as he did so.  First Tr. at 187; Second Tr. at 58.  Trooper Lemery saw that the license was from Maine.  First Tr. at 187.  Defendant also handed over the rental contract.  Gov.'s Ex. 5; see First Tr. at 190 (indicating Trooper Lemery later had the rental

---

[15]     Government's Exhibit 5 is a video of the entire encounter between Trooper Lemery (and later other troopers) and Defendant and the passenger.  Citations to it are provided only when necessary to supplement the testimony of the troopers.

contract in his hand).  Defendant "appeared nervous."  Second Tr. at 57.  Trooper Lemery

could tell Defendant was "breathing heavy" because "his stomach was rising and falling," and

he was taking "real heavy labored breaths."  First Tr. at 187.  Trooper Lemery could also see

Defendant's "carotid artery on the right side of his neck pulsating rapidly[.]"  Id.; Second Tr.

at 57-58.

Trooper Lemery read the Florida identification card in Ms. Watts's lap.  First Tr. at

186.  He asked if she was Ms. Watts and if she still lived at the address on the card.  Id.  She

responded in the affirmative to both inquiries.  Id.

Trooper Lemery asked Defendant to step out of the vehicle and asked if he had any

weapons on him.  Id. at 187-88; Second Tr. at 18-19.  Defendant responded that he did not.

Second Tr. at 18.  Defendant explained that he had previously been stopped that day, and

he handed Trooper Lemery a copy of the warning he had received.  First Tr. at 187-88;

Second Tr. at 15, 20, 58.  As he did so, his hand was shaking.  First Tr. at 188.

Trooper Lemery asked where Defendant was coming from, and Defendant responded

he had just been in Houston.  Id. at 188-89.  Trooper Lemery, knowing that it is about 1800

miles round-trip from Ocala to Houston and having determined the minivan was rented just

two days prior, commented that was a rather short trip.  Id. at 189.  Defendant explained

that, "[l]ike [he] told the other officer," he was working for Dade City Automax inspecting cars

so the dealership could decide whether to buy them.[16]  Id.; Second Tr. at 27, 31.  Defendant

also explained in detail how it was that he decided to get into this type of work and how he

---

[16]     Dade City Automax is located in Dade City, Florida on Highway 301.  See Def.'s Ex. 1 (address
and map).

knew the people for whom he worked. Gov.'s Ex. 5. Trooper Lemery asked what business Defendant had been to in Houston. First Tr. at 190-91; Second Tr. at 32-33; Gov.'s Ex. 5. Defendant stated it was a garage, but he did not know the name. First Tr. at 191; Second Tr. at 33.

When testifying during the hearing, Trooper Lemery contrasted Defendant's "long, drawn-out responses about how he became employed and met [the Dade City Automax] folks" with Defendant's "vague answer" regarding "something specific, such as . . . who owned the company." Second Tr. at 58. These inconsistencies made Trooper Lemery "even more suspicious." Id. Trooper Lemery testified that through his experience as a law enforcement officer, he "ha[s] knowledge of Dade City Automax involved in cocaine trafficking." First Tr. at 190. Given this knowledge, combined with the inconsistencies in Defendant's explanation, Trooper Lemery "was getting very suspicious of this traffic stop." Id.

Trooper Lemery left Defendant standing in front of his patrol vehicle while he got inside the passenger side and ran Defendant's license, a Wanted Persons check, and a criminal history check. First Tr. at 191-93. While he was awaiting the results, Trooper Lemery walked back to the minivan and retrieved Ms. Watts's identification card. Id. at 193. He also asked her age. Id.; Second Tr. at 38. She responded that she was twenty. Gov.'s Ex. 5; see Second Tr. at 38 (indicating Ms. Watts is "an adult"). He asked whether Defendant was a family member, and she stated he was her boyfriend. Gov.'s Ex. 5. Concerned about the Ms. Watts's well being, the age difference between her and Defendant, and her being wrapped in a blanket without any visible clothing, Trooper Lemery also asked

her if she was "there on her own free will." First Tr. at 193-94. She responded that she was, id. at 193, and she offered to call her mom to confirm there was no issue with her being there, Second Tr. at 37-38. Trooper Lemery declined to have her place the call. Id. at 38.

Trooper Lemery returned to Defendant and asked whether his license had ever been suspended or whether he had ever been arrested. First Tr. at 194; Second Tr. at 39. Defendant responded that his license had been suspended once when he was younger. First Tr. at 194; Second Tr. at 39. Defendant also stated he had been arrested once for fighting, and he explained the circumstances. Second Tr. at 39, 42; Gov.'s Ex. 5.

Trooper Lemery walked back to his patrol vehicle and ran Ms. Watts's identification card information to ensure she was not a missing person or wanted for any reason. First Tr. at 195; Second Tr. at 38. Trooper Lemery determined that Ms. Watts had not been reported missing and was not wanted. First Tr. at 195-96. While still awaiting the results of Defendant's checks, Trooper Lemery retrieved his warning book and met Defendant outside the patrol car where Defendant was waiting. Id. Trooper Lemery asked Defendant how much money he had been paid to take the trip to Houston to check out the vehicles. Id. at 196. Defendant responded that he had been paid $200 excluding expenses for which he would be reimbursed. Id.; Second Tr. at 35. Trooper Lemery thought that was a very small amount to be paid for the type of trip Defendant was taking. First Tr. at 196. Based upon Trooper Lemery's experience "dealing with criminal interdictions, stopping car haulers routinely, [and] dealing with people that do what [Defendant] said he was doing," when Defendant claimed he was paid "$200 to inspect four cars [for an] 1800-mile trip, [Trooper Lemery did not] buy it for a second[.]" Second Tr. at 44.

While writing a warning, Trooper Lemery was contacted by his dispatcher regarding Defendant's criminal history.  First Tr. at 196-97.  Trooper Lemery returned to his patrol vehicle and pulled up Defendant's criminal history on the computer that had been sent by dispatch.  Id. at 197.  Contrary to the one arrest Defendant had admitted, there were actually four.  Id.  Trooper Lemery also learned Defendant had been convicted of arson, a felony. Id. at 198.

Trooper Lemery returned to Defendant, asked him about the arson conviction, and requested permission to search the minivan.  Id. at 198-99.  Defendant explained that the conviction happened when he was a teenager.  Gov.'s Ex. 5.  He refused the request to search the minivan, stating that the other Trooper had already searched it.  Id.  When pressed whether the other Trooper actually searched it, Defendant clarified that he had come with the dog and "looked inside."  Id.

Right around this time, at about 3:41 p.m., Trooper Creech arrived.  First Tr. at 199. Knowing that Trooper Creech does not like an occupants in a vehicle when it is sniffed by his canine, Trooper Lemery explained to Trooper Creech that there was a young woman in the minivan wrapped up in a blanket.  Id. at 199-200; Gov.'s Ex. 5.  Trooper Lemery, still writing the warning, asked Defendant whether it was his intent to keep the rental minivan for five more days.  First Tr. at 200-01.  Defendant responded that he was going to keep it because he was going to check out some other vehicles.  Id. at 201.

In the meantime, Trooper Creech had Ms. Watts step out of the minivan.  Id. at 200; Second Tr. at 89.  She met Trooper Lemery and Defendant at the front of Trooper Lemery's patrol vehicle.  Gov.'s Ex. 5.  Trooper Lemery returned Defendant's driver's license and Ms.

Watts's identification card at approximately 3:45 p.m., but he continued writing the warning. First Tr. at 200-01; Second Tr. at 50.

Just as Trooper Lemery finished writing the warning, see Gov.'s Ex. 6 (warning), Trooper Creech deployed his canine, Nick, to conduct an exterior sniff of the minivan, First Tr. at 201. While the dog was sniffing, Trooper Lemery returned to his patrol vehicle to confirm that Defendant had been arrested for certain charges that Defendant had earlier disputed to a degree when confronted about them. First Tr. at 201. After confirming the arrests, Trooper Lemery asked Defendant to stand outside the passenger side of the patrol vehicle so they could view Defendant's criminal history on the computer screen while Trooper Lemery explained what was found. Id.

While Trooper Lemery was talking to Defendant, Trooper Creech gave Trooper Lemery a "nonverbal indication that the canine had alerted" to the presence of narcotics in the vehicle.[17] First Tr. at 201; see also Second Tr. at 90, 94. Based upon this indication, Trooper Lemery asked Defendant to put his hands on his head so he could search Defendant's person to ensure he did not have a firearm. First Tr. at 201. Trooper Lemery also asked if Defendant had any knives, and Defendant responded in the negative, stating instead that he had about $300 in one pocket and $800 in another. Id.; Gov.'s Ex. 5. When Trooper Lemery searched Defendant's person, he actually found a total of $1,751. First Tr. at 201-02.

Defendant and Ms. Watts were placed in the back of Trooper Lemery's patrol vehicle. Id. at 202. Trooper Lemery, Trooper Creech, and Trooper Morgan, who had arrived during

---

[17]     The circumstances surrounding this alert are discussed in more detail infra at Part III.B.

the canine sniff, then searched the minivan.  Id.  While searching, the troopers discovered

multiple kilograms of suspected cocaine on the left rear quarter panel of the minivan "sitting

on top of the jack accessory bag[.]"  Id. at 205-07; see Gov.'s Exs. 12A, 12B, 12C

(photographs of the kilograms of suspected cocaine).

Defendant was placed under arrest, and he denied knowledge of the cocaine in the

vehicle. First Tr. at 205; Gov.'s Ex. 5.  The troopers then finished searching the vehicle. See

Gov.'s Ex. 5.  In all, seven kilograms of cocaine were discovered.  First Tr. at 207.  Troopers

also found "a misdemeanor amount of marijuana, some small amount of crystal

methamphetamine, and some . . . drug paraphernalia" in the Ms. Watts's purse.  Id.; see

Gov.'s Exs. 13, 14 (photographs of purse and items discovered in it).

Although the hand-written warning was completed, it was never issued to Defendant.

First Tr. at 213.  Trooper Lemery also completed a computer-typed warning "[p]robably days

later when [he] was doing [his] report."  Second Tr. at 53; see Def.'s Ex. 2 (typed warning).

The entire encounter between Troopers Lemery, Creech, and Morgan and Defendant

and Ms. Watts was captured by a dashcam on Trooper Lemery's patrol vehicle.  First Tr. at

177-78; see Gov.'s Ex. 5.  This includes both video and audio.  See Gov.'s Ex. 5.[18]  As the

video of the encounter reflects, the entire length of the stop from the time Trooper Lemery

activated his lights to pull over Defendant to the time Nick alerted was about twenty minutes

(3:27 p.m. to 3:47 p.m.).  See id.

---

[18]     Because Defendant and/or Ms. Watts are standing in front of the patrol vehicle as the canine
is sniffing the minivan that is also parked in front of the patrol vehicle, large portions of the sniff are not visible
in the video.

**B.  Training of Canine at Issue and Circumstances of Canine Sniff**

Nick is a four-year-old German Shepherd.  Second Tr. at 67.  He and Trooper Creech have worked together for two years.  Id.  Trooper Creech is the only trooper with whom Nick has worked.  Id. at 69.  Nick's veterinary records are kept by FHP.  Id. at 67-68.  He has no health issues.  Id. at 68.

Nick is a dual-certified canine, meaning he is certified in both patrol (criminal apprehension, building searches, and human tracking) and narcotics detection.  Id. at 68-69.  He was first certified in December 2013.  Id. at 79.  Trooper Creech uses different commands for Nick to search for humans ("[z]ook") and articles ("seek") than he does for narcotics ("gift").  Id. at 70-71, 109-10.  Nick is trained to detect five different types of narcotics: cocaine, heroin, marijuana, methamphetamine, and MDMA.  Id. at 77.

Together, Trooper Creech and Nick completed more than 720 hours of initial training: 400 in patrol and 320 in narcotics.  Id. at 68.  This training lasted about seven months.  Id.  It was run by a regional canine instructor for FHP.  Id. at 96.  FHP follows the guidelines for nose dogs established by the International Forensic Research Institute.  Id. at 99.

Trooper Creech described in detail the process that he and Nick went through for narcotics training.  For the first week, they worked on what is known as a "control retrieve." Id. at 72.  This is designed to get the canine "imprinted on the odors."  Id.  Trainers would insert drugs into pipes and throw them into a field.  Id.  Nick would be spun around so he could not see where the pipe landed.  Id.  The command "gift" would be given, and Nick would search for the pipe using his nose.  Id.  When Nick found the pipe and returned it,

Trooper Creech would use the pipe to play with him.  Id.  Playing with the pipe further imprinted in Nick's olfactories the odor of the drugs inside the pipe.  Id.

Once satisfied that the scent was successfully imprinted (after about one to one and one-half weeks), the two moved on to exterior vehicle searches.  Id. at 72-73.  For these, an instructor would place a "hide," meaning hidden narcotics, somewhere on the exterior of a vehicle (on the tag, around the hubcap, etc.).  Id. at 73.  Trooper Creech and Nick would start downwind so the wind would blow in Nick's face.  Id. at 74.  That way Nick had a better chance of finding the hide.  Id.  They would then make two to three passes of the vehicle, starting low, then going high, then to the middle.  Id.  They spent about two to three weeks in this phase before moving to the interior of vehicles using a similar method.  Id. at 76.  After that, they moved on to buildings, id., and then luggage, id. at 77.

After the training was complete, the two had to pass an examination before becoming certified.  Id. at 79.  The examination covered interior and exterior of vehicles, building surfaces, and luggage.  Id.  Nick passed all aspects of the examination, resulting in his initial certification.  Id.; see Gov.'s Ex. 8 (certification for narcotics).

In addition to the initial certification, the pair is required to continue training and to recertify each year.  Second Tr. at 82; see Gov.'s Ex. 7 (compact disc containing training records).  The continued training must be a minimum of ten hours per week in narcotics and patrol, and it entails the same routines they performed in the initial training.  Second Tr. at 82-83.  Nick has never missed any targets during recertification.  Id. at 83.  He has never been decertified.  Id.

Nick has trained in all sorts of environments: "[h]ot, cold, rain, and . . . any type of environment [Trooper Creech can] expose [Nick] to, just to make him better[.]" Id. at 81.  As a result, weather does not impact Nick's ability to alert.  Id. at 81-82.

Another critical aspect of training is the handler ensuring that he does not get too close to the canine to cause a false alert.  Id. at 96, 109.  Trooper Creech testified that to ensure this does not happen, he "allow[s] the dog to work independently" by using a six-foot leash.  Id. at 97; see also id. at 109.   So, while Trooper Creech directs Nick, the trooper follows behind the canine to allow the canine to work on his own.  Id. at 109.

When Nick alerts to the presence of narcotics, he is rewarded by getting to play with a plastic or steel pipe.  Id. at 107-08.

Trooper Creech described the process of an "alert" to the presence of narcotics, as he knows it.  Id. at 74-75, 114-16.  According to Trooper Creech, an alert is a "change of body posture, increased respirations to any odor that [Nick] is trained to detect."  Id. at 74; see also id. at 114.  A "[c]hange in body posture is a head snap [or] the wagging of the tail." Id. at 75; see also id. at 114.  Trooper Creech also indicated that an increased respiration happens "when he's actually sniffing out the odors," and it means that he is "sniffing quicker or faster."  Id. at 75.

Although Trooper Creech described the above behavior as an "alert," he also testified that Nick is a "[p]assive" alert dog, meaning he's trained to sit when he smells the odor of narcotics.  Id.  An "aggressive" alert dog, by contrast, is trained to scratch when the odor of narcotics is detected.  Id.  Nick was trained as a passive alert canine because it prevents property damage that can be caused by scratching.  Id.

Trooper Creech testified that for Nick, sitting is actually "the final response." Id.; see also id. at 91.  This "final response" is a trained behavior, whereas the above-described "alert" is not.  Id. at 91; see also id. at 114.  According to Trooper Creech, Nick "works to the odor" and "when he gets scent of the odor, he just [does not] sit." Id. at 91.  Trooper Creech continued:

> We don't want him to do that.  That's not a– an alert is not a trained behavior.  Once he starts to alert, then he's going to try to work to the odor, and that's what causes his head to go up under the vehicle.  He's trying to alert to get as close to the odor as he can.

Id.  Trooper Creech elaborated that the "final response" of sitting generally only comes when Nick "gets as far as he can" and actually gets to the source of the smell.  Id. at 115.  Because he is typically sniffing vehicles from the outside and the contraband is on the inside, "nine times out of ten, he's not going to be able to do that[.]"  Id.

Trooper Creech stated that FHP is governed by the Florida Department of Law Enforcement ("FDLE") Standards with respect to an alert that gives rise to probable cause to search a vehicle.  Id. at 119.  According to Trooper Creech, FDLE "define[s] the alert as the increased respiration and body posture when the dog first encounters an odor he's trained to detect."  Id.  In addition, the International Forensic Research Institute ("IFRI"), which governs certifications of the FHP canines, base their certification process on an alert rather than a final response.  Id. at 99, 119-20.

On the day in question, Nick gave two "alerts."  Id. at 93.  One was on the passenger side of the minivan.  Id. at 92.  Because the window was rolled down, "Nick tried to jump inside the vehicle."  Id.  Trooper Creech testified that he "went high, put his paws up on he actual window or the seal.  And he's alerted.  He's trying to work to an odor."  Id.  Trooper

Creech further testified that after this alert, Nick "was going to give [him] a final response [by sitting]," but "as a handler, [Trooper Creech] pulled him off." Id.  The second alert was at the rear left (driver's side) bumper of the minivan. Id. at 97, 98.  According to Trooper Creech, Nick "actually tried to– he dipped his head up under the vehicle" which means that "he tried to trace an odor." Id. at 97.

Nick never gave the final response of sitting during the vehicle search on the day in question. Id. at 93, 110, 113.  According to Trooper Creech, it is "real common" for Nick to give an alert but never give a final response. Id. at 93-94; see also id. at 117.  Trooper Creech testified that Nick gives the final response by sitting "[v]ery seldom[.]" Id. at 112; see also Gov.'s Ex. 7 (records reflecting approximately six final responses in Nick's approximately 100 deployments).

In their time working together, Nick has been deployed about 100 times. Second Tr. at 83; see Gov.'s Ex. 7 (compact disc containing deployment log).  The deployment log that Trooper Creech maintains, see Gov.'s Ex. 7, contains the following information about each deployment: "[t]ime, date, location, case number, [and whether] any contraband was located," Second Tr. at 85.  It also contains a "brief narrative" of the circumstances of each deployment. Id.

Of the 100 times Nick has been deployed, he has alerted a little more than one half of them. Id.  "[O]ut of [the approximate] 100 vehicles that he's sniffed, there [were] 10 of those vehicles [on which he] alerted and there was no contraband located." Id.  Trooper Creech testified about some possible reasons why narcotics or contraband would not be located even though Nick alerts. Id. at 85-86.  Examples include that narcotics had recently

occupied the vehicle but had been removed, and that law enforcement officers simply could not find the narcotics.  Id. at 85-86, 111.  According to Trooper Creech, although Nick "alerted" all ten times in which contraband was not located, he never gave a final response by sitting.  Id. at 112.

## C.  Ms. Russell's Testimony

Ms. Russell is a canine trainer.  Second Tr. at 123.  In terms of her training and education, she first began to work with canines during her four-year stint from 1979-1983 in the United States Air Force.  Id. at 124.  After basic training, she attended the law enforcement academy, followed by "patrol dog handler school."  Id.  The patrol dog handler school included both a classroom component and "field work": "building searches, vehicle searches, and then a final exam at the very end."  Id.  Ms. Russell testified that this type of training is "virtually the same" training as the training that the FHP canine handlers go through, and it includes both patrol and narcotics detection training.  Id. at 140-42.

Upon the conclusion of the training, Ms. Russell passed the final exam, and then "served dual purpose as a law enforcement officer and a canine handler."  Id. at 125.  For three years, Ms. Russell had a canine assigned to her like FHP troopers do.  Id. at 143.  Ms. Russell's canine was dual certified.  Id.  After serving in the Air Force for four years, she was honorably discharged.  Id. at 125.

Ms. Russell then started "action dog training[.]"  Id.  That means she trained canines in a variety of contexts, including "in-home dog training with clients, group class training, . . . [and] accelerant dog [training and certification.]"  Id. at 125-26.  She also "attended symposiums" as well as "conferences for accelerant dog training[.]"  Id. at 125.  Ms. Russell

worked with an accelerant canine in 1992, id. at 138, and she trained that canine "[t]o detect the odor of accelerant present in a fire scene" after a fire had burned an area, id. at 123; see id. at 126.  According to Ms. Russell, although an accelerant canine is trained to detect a different odor than a narcotics canine, "the principles and guidelines are about the same." Id. at 139.

Ms. Russell is currently a "nose work judge for the United Kennel Club" and "the president of a . . . nose work club."[19] Id. at 127; see id. at 143.  Ms. Russell also "conduct[s] and train[s] nose work classes" in which she teaches pet owners to work with dogs to become nose dogs.  Id. at 127.  She does not currently work with any law enforcement agencies.  Id.

As to judging nose work competitions for the United Kennel Club, Ms. Russell is essentially responsible for evaluating competitions in which handlers and canines work together and compete against other handlers and canines in nose work.  Id. at 129-30. While these competitions involve nose work, they do not include searching for narcotics. Id. at 144.  Instead, they mainly involve searching for "distilled oils, of Birch and Anise, Vetiver, and Myrrh" that are poured on cotton swabs.  Id. at 146-47.  Aside from not including narcotics, the competition "elements are very similar to law enforcement" and include the "interior of a vehicle, the exterior of a vehicle, building searches and container searches." Id. at 151.  Ms. Russell places hides for the competitions, and then "determin[es] if the . . . dog correctly alerts on the odor in the given spot that it's in." Id. at 130.  She has been judging these competitions for about one year.  Id.

---

[19]     According to Ms. Russell, nose work is "detection of a specific odor."  Second Tr. at 145.

Ms. Russell keeps up with her training in nose dog work "mainly through social media" such as Facebook pages for "the National Association of Canine Scentwork" and "[t]he Association of the Detector Dog Agency[.]" Id. at 128. Ms. Russell testified that she has, in one form or another, maintained an interest in canine nose work for her entire career. Id. Her specialty, however, is "behavior consulting," in which she helps with behavior problems in canines. Id. at 128-29.

Ms. Russell had never testified in court prior to the hearing in this case, and she has never served as an expert witness. Id. at 122. She became involved in this case after having been contacted by defense counsel, who met her through hiring her to train his first dog a number of years ago. Id. at 123, 138. Counsel asked her to review the videos of Marko's and Nick's deployments. Id. at 130-31. She also reviewed the canines' training and maintenance records, as well as their deployment records. Id. at 131. Her main focus, however, was Nick (the canine on the day in question who alerted to the presence of narcotic odor). Id. She rendered an opinion about Nick's reliability and whether Nick gave a valid alert to the presence of narcotic odor when he conducted the exterior vehicle sniff. Id. at 130-31; see id. at 137.

In reviewing Nick's training records, Ms. Russell found it noteworthy that "[t]he dog is always perfect" and never has made any documented mistakes in training. Id. at 132. She considered this to be "one of [her] main flags that sent up when [she] reviewed the records." Id. The other item of interest to Ms. Russell was that Nick was once changed for one week to be an aggressive alert canine, meaning he was trained to scratch, but was then changed back to a passive alert canine, meaning he is currently trained to sit. Id. Ms.

Russell was also concerned with the reliability of the deployment records because of a mislabeling of two deployment numbers (one of which is actually the deployment at issue in this case).  Id.

Ms. Russell also testified about some concerns she had when reviewing the video of Nick's deployment contained in Government's Exhibit 5.  Id. at 133-35.  The first concern was that the canine made several passes around the vehicle.  Id. at 133.  The second concern was "that the dog appears to be being led around the vehicle those two times.  And then three passes were made at the back of the vehicle."  Id.  According to Ms. Russell, "[t]he dog is not working . . . independently of the handler" because "[t]he handler is out in front of the dog and tapping at every area where he wants the dog to work."  Id. at 134.  Ms. Russell testified that this could have induced a false alert.  Id.  Ms. Russell recognized, however, that a six-foot leash, such as the one Trooper Creech uses, "is great."  Id.

Ms. Russell also took issue with Trooper Creech's description of what an alert to the presence of narcotics is.  Id. at 134-37.  She indicated that when a canine "realizes his job is about to happen, he should get excited.  The dog should be motivated and should be enthusiastic."  Id. at 135.  Ms. Russell further stated that once the canine finds the scent that he is trained to find, "[h]e should display his trained behavior in response to the presence of odor, which in [Nick's] case is a sit."  Id.  According to Ms. Russell, Nick not doing what he was trained to do– sit– is of particular concern:

> [I]f the dog doesn't give a definitive final response, anything could be considered an alert.  So interest can be considered an alert, and the behaviors that [Trooper Creech described], the head turning, the tail wagging, those, to me, are interests that he . . . could possibly have detected odor, but it's not a final response . . . in the form of a sit.

Id. at 135-36; see also id. at 161.  Ms. Russell elaborated:

> [T]he turning of the head, the snapping of the head, the tail wagging excitably is part of [a difference in a dog's behavior when he smells an odor] that [a handler] must recognize.  And once [the handler] recognize[s] it, doesn't mean that [the canine is] on the odor, you know, that [the canine has] found the origin of the odor, it means he's detected the odor.  And from that it's up to the dog and the team to follow . . . the odor as close to the origins as they can get to where it's coming from.

Id. at 155.  When the canine is as close as he can possibly get to the source of an odor, according to Ms. Russell, he should give a final response.  Id. at 153.  Ms. Russell testified that a canine who does not give the final response of sitting or scratching during the competitions she judges is deemed to have failed.  Id. at 136.  She also stated that these final responses must occur for a minimum of three seconds.  Id. at 137.

Ultimately, Ms. Russell opined with respect to this case that Nick did not give a valid alert to the presence of narcotics on the day in question.  Id.  This is because he did not sit. Id.

### IV.  Parties' Positions/
### Summary of Recommendation

Defendant argues that the evidence obtained during the second traffic stop on December 10, 2014, including the "[i]dentification of Defendant," "[a]ll statements made by Defendant," and "[a]ll other physical evidence seized or information acquired as a result of the stop, detention and search, including cocaine and contraband," Motion at 4, must be suppressed for the following reasons.  First, the second stop "was pretextual and [Trooper Lemery] lacked probable cause to support the traffic stop."  Motion at 6; see also Defendant's Supplemental Memorandum at 9-10.  Second, Defendant contends that "once the minivan [was] stopped [for the second time], under the guise of a traffic violation,

Trooper Lemery . . . improperly and unnecessarily extend[ed] the duration of the traffic stop to conduct an investigation outside the scope of the traffic stop and its underlying justification."  Motion at 6; see also Defendant's Supplemental Memorandum at 10-16. Third, Defendant argues that the stop was prolonged "for the sole purpose of running [canine Nick] around the minivan."  Motion at 8; see also Defendant's Supplemental Memorandum at 10-16.  Fourth, Defendant asserts "that the alert by Trooper Creech's [canine, Nick,] was unreliable and therefore did not provide probable cause for the search of the minivan." Motion at 9.  Regarding the fourth argument, that Defendant labels as his "most important[] one," Defendant focuses on the fact that Nick undisputedly never gave a final response of sitting to indicate he had detected the presence of narcotic odor. Defendant's Supplemental Memorandum at 16-20, 22.

Responding, the Government contends first that Trooper Lemery had reasonable suspicion and then probable cause to believe Defendant was violating Florida law by speeding, and the resulting stop was permissible.  Response at 3-4; see also Government's Supplemental Memorandum at 1-2.  The Government then addresses Defendant's second and third arguments together, countering that Trooper Lemery did not prolong the stop past its initial purpose, and even if he did, he had reasonable suspicion of criminal activity and reasonably detained Defendant for the purpose of investigating his suspicion.  Response at 4-5; see also Government's Supplemental Memorandum at 3-6.  Finally, regarding the canine Nick, the Government focuses on his training and Trooper Creech's testimony that Nick alerted.  Response at 6-7; see also Government's Supplemental Memorandum at 6-7.

The Government argues that the alert provided probable cause for the troopers to search the minivan.  Response at 6-7.

Having considered all of the parties' arguments and the evidence, the undersigned recommends that the Motion be denied.  In sum, the undersigned finds that Trooper Lemery had probable cause to stop the minivan for speeding; the stop was reasonable in duration and scope; and Nick, the canine, validly alerted to the presence of narcotic odor that gave rise to probable cause to search the minivan.  The reasons for the recommendation and these findings are discussed below.

## V.  Discussion

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (emphasis and citation omitted).  "The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment."  Id.  This must be demonstrated by a preponderance of the evidence.  See United States v. Matlock, 415 U.S. 164, 177 n.14 (1974) (stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").  With this burden in mind, the undersigned addresses the various arguments.

### A. Probable Cause to Stop the Minivan for Speeding

Defendant first contends that Trooper Lemery lacked probable cause to stop the minivan (the second time Defendant was stopped on the day in question) for speeding.  In

making this argument, Defendant recognizes that Trooper Lemery testified he paced Defendant at seventy-eight miles per hour, but Defendant argues that the Government did not present "any evidence that the trooper's speedometer was ever certified and calibrated, much less certified and calibrated in 2014." Defendant's Supplemental Memorandum at 6, 9-10. Because this information is required by Florida law, says Defendant, the probable cause determination made by Trooper Lemery cannot stand. Id.; see Fla. Stat. § 316.1905(1) (requiring speed measuring devices to be regularly tested for accuracy if used for speed enforcement). Defendant also contends that the speeding justification for stopping him was merely pretextual given that Trooper Lemery knew the minivan had been stopped previously and the troopers who had stopped him were suspicious of drugs being in it. See Defendant's Supplemental Memorandum at 6, 9-10.

The Government responds that Trooper Lemery's underlying motive was irrelevant because Trooper Lemery was justified in stopping Defendant for speeding. Response at 3-4. The Government further contends that although it did not present evidence of the certification and calibration of Trooper Lemery's speedometer, it nevertheless has demonstrated the reasonableness of the traffic stop for speeding based upon his "observations combined with the speedometer reading[.]" Government's Supplemental Memorandum at 2 (citation omitted).

Regardless of a law enforcement officer's motive for stopping a particular vehicle, if there is a constitutionally permissible reason for stopping the vehicle, the stop will be upheld. See United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (citing Whren v. United States, 517 U.S. 806 (1996)); see also United States v. Harris, 526 F.3d 1334, 1337 (11th

-33-

Cir. 2008) (stating that "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment" (quotation and citation omitted)).  The undersigned, therefore, must consider whether Trooper Lemery had a constitutionally permissible reason for stopping the minivan.

"Traffic stops qualify as seizures under the Fourth Amendment." United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir. 2007) (citation omitted).  "[A] traffic stop is a constitutional detention if it is justified by reasonable suspicion under Terry [that criminal activity has occurred or will occur] or probable cause to believe a traffic violation has occurred. . ." United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003) (citing Whren, 517 U.S. at 810); see also Harris, 526 F.3d at 1337 (citation omitted).

With respect to the traffic violation of speeding, "[t]he Florida statute requiring speedometer testing is irrelevant to the Fourth Amendment reasonableness analysis because an officer's observation of a traffic violation is enough to create probable cause under the Fourth Amendment[.]" United States v. Rowls, 402 F. App'x 467, 468-69 (11th Cir. 2010) (citation omitted).  In Rowls, the United States Court of Appeals for the Eleventh Circuit found no error in the district court's denial of a motion to suppress when officers who "had never served in traffic enforcement and had not received any training in 'pace clocking' a vehicle" used speeding as a justification for stopping a vehicle as "part of an investigation into [the defendant's] drug activities[.]" Id. at 468.  The defendant in Rowls, citing Florida law, argued "that the traffic stop violated the Fourth Amendment because it was based upon two officers' mistaken belief that they could use untested speedometers of their patrol cars

to determine [the defendant's] speed." Id. The defendant's speed had been established by the officers after one mile of pacing to be "ten miles above the posted speed limit." Id. There was no evidence presented to the district court regarding "when, if ever, the patrol cars' speedometers had been tested." Id. In addition, the officer who actually stopped the defendant "did not personally observe him commit any traffic violation, instead relying on the information provided by the two pacing officers." Id.

Here, Trooper Lemery himself observed the minivan and began to pace it at seventy-eight miles per hour, eight miles per hour over the posted speed limit. Trooper Lemery testified credibly that after being paced, the minivan slowed to seventy-five miles per hour, although he did not see any brake lights. That Trooper Lemery did not see brake lights, even though the vehicle slowed, is consistent with Defendant's explanation during the stop that he had the vehicle on cruise control, although Defendant claimed it was set at seventy-four miles per hour. Defendant easily could have let up on the cruise control without having to touch the brakes when Trooper Lemery was pacing him. Like the officers in Rowls, it was not unreasonable for Trooper Lemery to rely on his observations and his speedometer in gauging Defendant's speed, see id., even though the Government provided no evidence of the speedometer's certification or calibration. Accordingly, the undersigned finds that Trooper Lemery indeed had probable cause to pull over the minivan for speeding.

**B. Length and Scope of Stop**

Defendant next argues that Trooper Lemery unreasonably extended the stop and unreasonably exceeded the purpose of the stop so the canine could arrive. Motion at 6-9; Defendant's Supplemental Memorandum at 10-16. The Government responds that Trooper

Lemery did not prolong the stop because the trooper was permitted a certain amount of time to investigate the traffic violation of speeding and the canine sniff occurred prior to the written warning being issued. Government's Supplemental Memorandum at 3-4. In addition, the Government contends that Trooper Lemery developed reasonable, articulable suspicion that criminal activity was afoot and thus was justified in briefly detaining Defendant for criminal investigatory purposes. Id. at 4-6.

"'Because a routine traffic stop is only a limited form of seizure,' . . . 'it is more analogous to an investigative detention than a custodial arrest.'" Ramirez, 476 F.3d at 1236 (quoting United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)). Therefore, the legality a traffic stop is analyzed under the standard articulated in Terry v. Ohio, 392 U.S. 1, 20-22 (1968). Chanthasouxat, 342 F.3d at 1275; Purcell, 236 F.3d at 1277; United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'– to address the traffic violation that warranted the stop and attend to related safety concerns[.]" Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2004)) (other citations omitted); see also United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (stating that under Terry, "[a stop must be] reasonably related in scope to the circumstances which justified the interference in the first place" (internal quotations omitted)).

In the context of stopping a vehicle for a traffic violation, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." Rodriguez, 135 S. Ct. at 1615 (internal alteration, quotation, and citation

omitted).  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. (citations omitted).  "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. (citations omitted).  While a law enforcement officer "may conduct certain unrelated checks during an otherwise lawful traffic stop, . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion demanded to justify detaining an individual."[20] Id.; see also Arizona v. Johnson, 555 U.S. 323, 333 (2009) (stating that "an officer's inquiries into matters unrelated to the justification for the stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop"); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (stating that officers may conduct a variety of checks on the driver and his car and request consent to search the car).  In addition, if an officer makes a "request for a criminal history check as part of his 'routine computer check,'" it is permissible as "part of the original traffic stop investigation."  United States v. Boyce, 351 F.3d 1102, 1107 (11th Cir. 2003) (citing Purcell, 236 F.3d at 1278).

Notwithstanding the above rules, a law enforcement officer may continue to hold an individual stopped for a traffic violation for investigative purposes when the "officer 'has [reasonable suspicion of criminal activity, i.e.,] a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Navarette v. California, 134

---

[20]     Under Terry, a law enforcement officer may stop an individual and briefly detain the individual for investigatory purposes if the officer has a reasonable, articulable suspicion that criminal activity is afoot. Terry, 392 U.S. at 30; see also United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000).

S. Ct. 1683, 1687 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)) (other citation omitted); see Rodriguez, 135 S. Ct. at 1622 (Thomas, J., dissenting) (citation omitted).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification[.]"  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).  A court views "the totality of the circumstances" to determine whether reasonable suspicion existed.  Id. (quotation and citation omitted).

Even when an officer develops such a particularized and objective basis to suspect criminal activity, however, his investigation must be "reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (internal quotations omitted).   In making this determination, several factors are relevant: "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention."  Id. at 1146 (internal quotations omitted).

In Rodriguez, upon which Defendant heavily relies, the United States Supreme Court found that a seven- or eight-minute delay between an officer completing a warning for a traffic violation and a drug-detecting canine alerting to the presence of narcotics unnecessarily lengthened the stop past its permissible purpose.  See Rodriguez, 135 S. Ct. at 1615-16. There, an officer pulled over an individual for driving on a highway shoulder, gathered the passengers' documentation, performed "a records check," and asked some

questions about where the individuals in the vehicle were coming from and where they were going.  Id. at 1612-13.  The individuals responded "that they had traveled to Omaha, Nebraska, to look at a Ford Mustang that was for sale and that they were returning to Norfolk, Nebraska."  Id. at 1613.  After completing the records check, the officer completed a warning, gave it to the driver, and gave back all documentation.  Id.  The officer testified that by that point, he had "all the reasons for the stop out of the way . . . took care of all the business."  Id. (internal quotations, alterations, and citation omitted).  Nevertheless, the officer detained the individuals in the vehicle for an additional seven to eight minutes for the purpose of deploying a drug-detecting canine.  Id.  The canine alerted to the presence of narcotics, the vehicle was searched, and a large amount of methamphetamine was found. Id.

Emphasizing that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'– i.e., adds time to– 'the stop,'" the Supreme Court held that the delay that occurred in Rodriguez was not permissible given the initial justification for the stop.  Id. at 1616 (citations omitted). Because the circuit court had not made a finding regarding whether the officer had reasonable suspicion to prolong the stop beyond its initial purpose, however, the Supreme Court remanded the case for further consideration of that question.  Id. at 1616-17.

Here, the undersigned finds for two independent reasons that Trooper Lemery did not unreasonably extend the traffic stop.  First, Trooper Lemery did not extend the stop past its initial permissible purpose: to address the traffic violation and attend to related safety concerns.  See Rodriguez, 135 S. Ct. at 1615.  Second, Trooper Lemery developed

reasonable, articulable suspicion during the stop that criminal activity was afoot, and he was justified in reasonably extending the stop– if he indeed did– to confirm or dispel those suspicions.  See Acosta, 363 F.3d at 1145.  These findings are explained in more detail below.

First, Trooper Lemery did not extend the length of the stop past its initial permissible purpose of addressing Defendant's speeding and Trooper Lemery's related safety concerns. In all, from the time Trooper Lemery activated his lights to pull over Defendant (3:27 p.m.) to the time Nick the canine alerted (about 3:47 p.m.) giving rise to probable cause to search the minivan, about twenty minutes elapsed.  During that time, Trooper Lemery did the following. First, he activated his lights and pulled over Defendant.  Second, he obtained Defendant's license and Ms. Watts's identification card.  Third, he inquired as to the accuracy of the information on the license and identification card.  Fourth, he ran permissible checks of both, including warrants checks, a missing persons check on Ms. Watts, and a license and criminal history check on Defendant.  Fifth, he inquired about where the two were coming from and where they were heading (much of this was done while awaiting the results of the checks).  Sixth, he began to write a warning for speeding but was interrupted by the dispatcher indicating that Defendant had several arrests and a felony conviction, contrary to what Defendant had told Trooper Lemery.  Seventh, he asked Defendant about the discrepancy that Defendant disputed to a degree.  Eighth, he finished writing the

warning.[21]  Ninth, he called Defendant to his computer to explain what was found with Defendant's criminal history.

Unlike <u>Rodriguez</u>, the canine here was deployed at the same time that the warning was being completed.  <u>See</u> <u>Rodriguez</u>, 135 S. Ct. at 1613.  Also unlike <u>Rodriguez</u>, here, Trooper Lemery was not finished with the initial purpose of the stop when the canine alerted, because at that time he was attempting to resolve a discrepancy between Defendant's admitted criminal history and what Trooper Lemery had viewed on the computer.  <u>See</u> <u>id.</u>

In sum, twenty minutes for all of the nine permissible acts was not unreasonable. Defendant argues that some of the checks were unnecessary given the prior stop and were essentially a ruse to keep Defendant there until the canine arrived.  <u>See</u> Defendant's Supplemental Memorandum at 14-16.  Trooper Lemery, however, had essentially no information regarding what Trooper Cabe had or had not done with respect to the various checks because that information had not been communicated to him.[22]  Defendant contends

---

[21]  Defendant contends that Trooper Lemery deliberately chose to hand write a warning, rather than doing it on the computer, "to legitimize his delay or produce something that would explain his writing while talking to Defendant."  Defendant's Supplemental Memorandum at 11; <u>see also</u> <u>id.</u> at 12.  Regardless of his chosen method, though, the record reflects that Trooper Lemery did not unreasonably delay in writing the warning. Defendant further contends that the time stamp of 3:27 p.m. on the later-completed typed warning (the same time Trooper Lemery activated his lights to pull over Defendant) somehow shows that the Trooper "had filled out the warning well before the detention ended and the only thing left to do was press print."  <u>Id.</u> at 13. Trooper Lemery testified, however, that he completed the typed warning as part of writing his report sometime later.  Accordingly, the time on that particular warning is of no import in determining a reasonable amount of time to issue a warning.

[22]  The undersigned declines Defendant's invitation to find Trooper Lemery's testimony on this point incredible.  <u>See</u> Defendant's Supplemental Memorandum at 15.  As part of his argument about the testimony supposedly being incredible, Defendant points to the Criminal Complaint submitted to Judge Toomey in support of seeking an arrest warrant, and he contends it "confirms that Cabe had indeed told Lemery about the stop which included the purpose of that stop - to check Defendant and his passenger for possible criminal activity."  <u>Id.</u> at 16 (citing Def.'s Ex. 3).  The Criminal Complaint, however, merely states that "Trooper Cabe passed the vehicle description to Trooper Lemery."  Def.'s Ex. 3, at 3.  It says nothing about information passing information regarding various computer checks.  <u>Id.</u>

that law enforcement cannot "continuously stop vehicles they are suspicious of every few miles for deminimus traffic violations and detain citizens for as long as they choose by purposely taking their time to complete warnings/citations, ignoring information, not communicating relevant information to each other and failing to tie into databases that are readily available." Id. at 16.  There is some appeal to Defendant's argument, and with different facts, that argument could very well be successful.  But in this case, on these facts, the undersigned finds that Trooper Lemery did not exceed the permissible bounds when he stopped Defendant, engaged in the inquiries, and ran the various checks.

In addition to being justified in briefly detaining Defendant for the above reasons, Trooper Lemery had reasonable, articulable suspicion to detain Defendant for brief investigatory purposes (if the stop indeed lasted past its initial permissible purpose). Trooper Lemery articulated the following information about his suspicion of criminal activity. First, Defendant and Ms. Watts never looked at him when he was pacing the vehicle, instead looking straight ahead and not talking at all.  Second, once pulling over the minivan, Trooper Lemery observed a number of articles in it that made it appear that the passengers had been driving for long periods without stopping, and he observed an air freshener in the rear view mirror.  Third, as Trooper Lemery approached the minivan, Ms. Watts, a young female who appeared to be a teenager, was wrapped entirely in a blanket, and it was unclear to Trooper Lemery whether she was wearing any clothes.  Fourth, Defendant appeared to be nervous: when Defendant handed over his driver's license, his hand shook; he was breathing heavily; and his carotid artery was pulsating rapidly.  Fifth, when Defendant handed over the warning from Trooper Cabe, his hand continued to shake.  Sixth,

Defendant's story about driving an 1800-mile trip in forty-eight hours to inspect vehicles for a car dealership was lengthy and suspect.   Seventh, Trooper Lemery knew from his experience as a law enforcement officer that the car dealership, Dade City Automax, has involvement in cocaine trafficking.  Eighth, when asked about his criminal history, Defendant admitted only to one arrest for fighting and failed to advise Trooper Lemery that he had in truth been arrested multiple times and had been convicted of arson, a felony.   Ninth, when Trooper Lemery advised Defendant what he had learned about his criminal history, Defendant disputed it to a degree, which in turn made Trooper Lemery feel it appropriate to show it all to Defendant on the computer.    All of these factors, taken in totality, amount to reasonable, articulable suspicion of criminal activity and justified a brief detainment past the initial purpose of the stop, if there was one.

In sum, the undersigned finds that Trooper Lemery did not unreasonably extend the stop.

**C. Canine Sniff**

Defendant's last and "most important[]" argument is that there was no probable cause to search the minivan because the canine, Nick, did not give his trained final response of sitting when detecting the smell of narcotic odor.  Defendant's Supplemental Memorandum at 16.  In so arguing, Defendant does not cite any authority addressing directly the alert versus final response issue, but he cites a number of cases that have "referenced the final response alert in dicta."  Id. at 18 (citations omitted).  The Government focuses on Nick and Trooper Creech's training and Trooper Creech's testimony that Nick alerted on the day in question.  Response at 6-7; see also Government's Supplemental Memorandum at 6-7.  The

Government argues that the alert provided probable cause for the troopers to search the minivan.  Response at 6-7.  Quite surprisingly, the Government spends only one paragraph addressing what Defendant labels his "most important" argument (the alert versus the final response).[23]  See Government's Supplemental Memorandum at 7.  The Government simply contends the Court should reject Defendant's theory because "he provides no case law to support this argument," while itself neglecting to provide any legal authority to support its position.  Id.  Further, the Government argues, again without citation to any legal authority, that Ms. Russell's testimony "should be given no weight as her experiences are irrelevant to the issue in this case."  Id.

With respect to dog sniffs and alerts, courts have recognized that an alert by a well-trained canine for the presence of narcotics can create probable cause and have evidentiary value.  See, e.g., United States v. Place, 462 U.S. 696, 707 (1983) (discussing the intrusiveness of a dog sniff in the context of Fourth Amendment protections); United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (citing prior Eleventh Circuit precedent and stating, "Our circuit has recognized that probable cause arises when a drug-trained canine alerts to drugs") (internal citations omitted); United States v. Toepfer, 317 F. App'x 857, 862 (11th Cir. 2008) (per curiam) (stating that "probable cause is established when drug-trained canine alerts to drugs") (citing Banks, 3 F.3d at 402).  To determine whether a canine is sufficiently reliable, the Supreme Court has instructed that the inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a

---

[23]     The original Assistant United States Attorney assigned to this case and who handled this matter through the filing of the supplemental memoranda has since left the United States Attorney's Office.

reasonably prudent person think that a search would reveal contraband or evidence of a crime." <u>Florida v. Harris</u>, 133 S. Ct. 1050, 1058 (2013).  To that end, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." <u>Id.</u> at 1057.  Because "[t]he better measure of a dog's reliability . . . comes away from the field, in controlled testing environments[, i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." <u>Id.</u> (footnote omitted).

Even so, a defendant "must have an opportunity to challenge such evidence of a dog's reliability," and that can be through "introducing his own fact or expert witnesses." <u>Id.</u> Regarding expert testimony on this issue, the general view is that although expert testimony for a suppression hearing should not be subject to a pre-hearing <u>Daubert</u> analysis,[24] "[e]ven at a suppression hearing, the district court must always consider any proffered expert's qualifications and determine, in its discretion, what weight to afford that expert's testimony." <u>Stepp</u>, 680 F.3d at 669 (citation omitted).  In making this determination, it may well be that <u>Daubert</u> principles are relevant and should be applied.  <u>See</u> <u>Banks</u>, 93 F. Supp. 3d at 1250.

---

[24]    <u>See</u> <u>United States v. Ozuna</u>, 561 F.3d 728, 736-37 (7th Cir. 2009) (observing that the defendant "cite[d] no law that effectively supports" the contention that <u>Daubert</u> applies "with full force in suppression hearings"; observing that the Rules do not apply in suppression hearings; finding that "[t]he primary rationale behind <u>Daubert</u> [(gatekeeping for the jury)] is not applicable in a suppression hearing"; and concluding that the district court did not abuse its discretion in accepting expert testimony during a suppression hearing without conducting a <u>Daubert</u> hearing); <u>United States v. Stepp</u>, 680 F.3d 651, 668-70 (6th Cir. 2012) (following <u>Ozuna</u> to conclude that it is not necessary to conduct an analysis under Rule 702 or <u>Daubert</u> prior to hearing expert testimony during a suppression hearing); <u>see also</u> <u>United States v. Banks</u>, 93 F. Supp. 3d 1237, 1250 (D. Kan. 2015) (concluding "that neither <u>Daubert</u> nor Rule 702 presents a threshold bar to the admissibility of . . . expert testimony, at least for the limited purpose of resolving defendants' suppression motion").

In Stepp, the United States Court of Appeals for the Sixth Circuit held that even though a district court erroneously excluded evidence of a supposed canine expert from a suppression hearing based on Daubert, the error was harmless.  Stepp, 680 F.3d at 670.  Said the Sixth Circuit, "the record . . . sufficiently establish[ed] that even had the district court permitted [the expert] to testify, [the expert's] opinion would not have constituted the 'competent and credible' evidence on which [district courts are permitted to] rely." Id.  The court then discussed the reasons for the finding, including the following discussion about the expert's background and qualifications:

> [The expert] was questioned at length about his background, demonstrating that he lacked the necessary qualifications to offer even minimally credible or reliable testimony on the subject of dogs sniffing for narcotics. [The expert] admitted to having trained only two or three drug dogs in the course of a fifty-year career, the last of which was ten years before the hearing.  He was not, nor had he ever been, a police-dog handler.  He had no certification on narcotics-dog training.

Id. (citation omitted).

Stepp is instructive here with respect to Ms. Russell's testimony.  Unlike the expert in Stepp, Ms. Russell did serve as a military police dog handler and obtained the required certifications.  See id.  But similar to the expert in Stepp, Ms. Russell's last experience handling or training a narcotics canine was a very long time ago (more than thirty years).  See id.  She did train an accelerant canine in 1992, but even that was more than twenty years ago.  Now, she focuses on working with pet owners, teaching classes on nose work and doing behavior consulting.  She also judges nose work competitions.  None of this nose work, however, is in the field of narcotics.  Although she testified the governing principles and guidelines are similar, the nature of the work she is doing now and the length of time

that has passed since she has worked in the field of narcotics are relevant considerations. In addition, although Ms. Russell stays up-to-date on nose work, she mainly gets her information from social media channels.

In short, the expert in Stepp was indeed less qualified than Ms. Russell. See id. Yet, Ms. Russell's qualifications do not give the undersigned a large amount of confidence that her opinions regarding Nick, the narcotics canine, are reliable. Accordingly, while the undersigned has considered Ms. Russell's testimony and opinions, they are afforded little weight.

With respect to Nick's reliability, the Government established his training through the testimony of Trooper Creech and by admitting into evidence the pair's training certificates and contraband search records. See Harris, 133 S. Ct. at 1058 (approving of "substantial evidence of [a canine's] training and his proficiency in finding drugs," including training records, when the defense's "focus[] on [the canine's] field performance[] failed to rebut the State's case") (citation omitted). In an attempt to rebut Nick's reliability as established by the Government, Defendant points to the approximately ten occasions that Nick has alerted (without giving a final response) and the resulting search revealed no contraband. See Defendant's Supplemental Memorandum at 18. This field performance, however, is not determinative, see Harris, 133 S. Ct. at 1058, and in any event, courts have approved of far lower reliability rates in the field than Nicks, see United States v. Bentley, 795 F.3d 630, 636 (7th Cir. 2015) (collecting cases from other circuits that approved of significantly lower field detection rates). Based on the testimony and the evidence presented on the issue, the undersigned finds canine Nick is reliable.

The other issue– whether Nick validly alerted to the presence of narcotic odor– is perhaps a closer question.  Trooper Creech answered this question in the affirmative, citing Nick's change in body posture, his excitedness that included an attempt at jumping inside the passenger side of the vehicle, his attempted final response of sitting prior to Trooper Creech "pull[ing] him off," and his dipping of the head under the rear driver's side of the vehicle in an attempt to trace an odor.  Ms. Russell, on the other hand, opined that Nick did not validly alert because he did not give a trained final response of sitting.  For the reasons stated below, the undersigned finds that Nick did validly alert to the presence of narcotics on the day in question.

Albeit in an unpublished opinion, the Eleventh Circuit has approved of similar behavior in a narcotics detection canine as a valid alert.  See United States v. Nelson, 309 F. App'x 373, 374-76 (11th Cir. 2009).  In Nelson, the defendant filed a motion to suppress evidence of cocaine and cash from a vehicle in which he was a passenger.  Id. at 374.  The Eleventh Circuit, in reviewing the district court's denial of the motion to suppress, held that "the district court did not err when it accepted the officer's testimony that the dog's change in breathing and body posture indicated the presence of narcotics."  Id. at 375.  The Court observed that "[t]he officer testified he had received more than 200 hours of training with drug-sniffing dogs, had been working with the dog in the instant case for nearly a month, and had been a canine handler for more than five years."  Id.  The Court concluded,

> Viewing the evidence in the light most favorable to the Government, and considering the great deference this Court gives to the district court's credibility determinations, it was not erroneous for the district court to conclude the officer's testimony about drug-dog handling and the dog's indications was credible, based on his experience with this and other drug-sniffing dogs.

Id. (citations omitted).

The United States Courts of Appeals for the Tenth and, later, the Ninth Circuits have specifically declined to adopt a rule that would "require the dog to give a final indication before probable cause is established." United States v. Parada, 577 F.3d 1275, 1282 (10th Cir. 2009) (upholding district court's determination that canine alerted when officer testified that the canine "alerted on the driver's side front door by stiffening his body, breathing deeply, and attempting to jump into the window"); United States v. Thomas, 726 F.3d 1086, 1098 (9th Cir. 2013) (following Parada, concluding "[i]ts rationale was on the mark: probable cause is measured in reasonable expectations, not certainties" (citations omitted)).  And the United States Court of Appeals for the Eighth Circuit recently upheld a canine sniff in which the canine on first sniff "stopped dead in his tracks and began to really detail the area between the bed of the truck and the cab of the truck," and on second sniff "stopped and detailed the same area as the first time." United States v. Holleman, 743 F.3d 1152, 1154 (8th Cir. 2014) (internal quotations and alterations omitted).  The canine handler in Holleman testified that these behaviors were "two definitive 'alerts' to the side of [the defendant's] truck." Id. at 1157.  The Eighth Circuit stated, "As a result, we are not concerned about [the canine's] failure to give a full indication[.]" Id.; see also United States v. Clayton, 374 F. App'x 497, 502 (5th Cir. 2010) (finding that "[s]o long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal

narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs").[25]

Here, Trooper Creech and Nick have worked together for more than two years; have undergone more than 720 hours of initial training and certification together (320 of which were in narcotics); and continue to retrain weekly and recertify yearly together.  With that background in mind, and having observed Trooper Creech's demeanor while he testified, the undersigned credits Trooper Creech's testimony about Nick's behaviors on the day in question.  Trooper Creech is trained to detect these natural, untrained responses in the canine as alerts to the presence of narcotic odors.  He twice detected these responses in this case.  Even the defense witness, Ms. Russell, recognized that these natural, untrained responses in a canine could be an indication that the canine is onto the scent of narcotic odor, although she opined that the trained final response of sitting should be the real indicator.  The undersigned credits Trooper Creech's opinion – over that of Ms. Russell – that these behaviors demonstrated alerts to the presence of narcotics.  Accordingly, the undersigned finds that probable cause to believe the minivan contained contraband was established by Nick's positive alerts. See, e.g., Nelson, 309 F. App'x at 374-76; Parada, 577 F.3d at 1282; Thomas, 726 F.3d at 1098; Holleman, 743 F.3d at 1157; see also Banks, 3 F.3d at 402 (stating the Eleventh Circuit "has recognized that probable cause arises when

---

[25]    Other courts, too, have recognized that "a canine 'alert' is not always an objectively verifiable event" and that "[i]n some instances, an alert is simply an interpretation of a change in the dog's behavior by a human handler." United States v. Outlaw, 134 F. Supp. 2d 807, 813 (W.D. Tex. 2001) (citing United States v. Dovali-Avila, 895 F.2d 206, 207 n.2 (5th Cir. 1990) (describing an alert as "tak[ing] a distinctive position or stance")); United States v. Trayer, 898 F.2d 805, 808 (D.C. Cir. 1990) (approving of the "idiosyncratic" alert method of a particular canine "who had been trained to exhibit aggressive behavior on detecting drugs, [but] instead froze and pointed at [a] compartment as would a bird dog").

a drug-trained canine alerts to drugs"). Because the alerts established probable cause to believe the minivan contained contraband, the search of the minivan was proper under the automobile exception to the warrant requirement.[26] See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999).

## VI.  Conclusion

For the foregoing reasons, it is

**RECOMMENDED:**

That Defendant George Henry Petrakis's Motion to Suppress Evidence from Unlawful Stop, Detention and/or Search (Doc. No. 36) be **DENIED**.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on December 14, 2015.

James R. Klindt
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies:

Hon. Timothy J. Corrigan
United States District Judge

Assistant U.S. Attorney (Taylor)
Mitchell A. Stone, Esquire
Shelley L. Thibodeau, Esquire
Lewis Lee Lockett, Esquire

---

[26]     As to Defendant's and Ms. Russell's other concerns about the way in which Nick was handled on the day in question (supposedly being led by Trooper Creech, not working independently, and making a number of passes), a review of the video of the sniff (much of which is blocked by Defendant and/or Ms. Watts standing in front of the dash cam) does not persuade the undersigned that the Trooper unjustifiably led Nick so as to take away the canine's independence. Additionally, the undersigned does not share Ms. Russell's concern about the number of passes that were made by the team given the accepted testimony that Nick alerted on two different parts of the vehicle.